[Cite as *McDonald v. McDonald*, 2014-Ohio-2861.]

STATE OF OHIO            )            IN THE COURT OF APPEALS
                         )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN         )

MELISSA MCDONALD                      C.A. No.      13CA010341

        Appellant

        v.                            APPEAL FROM JUDGMENT
                                      ENTERED IN THE
JASON MCDONALD                        COURT OF COMMON PLEAS
                                      COUNTY OF LORAIN, OHIO
        Appellee                      CASE No.      10DU072247

DECISION AND JOURNAL ENTRY

Dated: June 30, 2014

HENSAL, Judge.

{¶1}    Melissa McDonald appeals from a judgment of the Lorain County Court of
Common Pleas, Domestic Relations Division.   For the reasons set forth below, this Court
affirms.

I.

{¶2}    Ms. McDonald and Jason McDonald married in June 1996.   They have two
children:  E.M., born April 1, 1997 and M.M., born January 15, 2002.   In addition, Mother has
an older child, K.M., who was not born of the marriage.   Father married Mother when K.M. was
three and Father had a good relationship with K.M. during the marriage.

{¶3}    In June 2010, Mother filed a complaint for a divorce.   The trial court entered a
decree in April 2011 that designated both parents as the residential parents and legal custodians
of the two minor children pursuant to a shared parenting plan.   Both parents maintained
residences nearby each other in Elyria.   K.M. continued to live with Mother until she went to

college and continued to stay with Mother when she returned from college. Shortly after the divorce, E.M. began to ask Father during his parenting time if she could return to Mother's home to help Mother out at the home. Father usually acquiesced to E.M.'s requests. Around July 2011, after having been punished for going to Mother's home without asking, E.M. began to refuse to visit with Father when Father would come to pick her and M.M. up for the scheduled parenting time. Notwithstanding E.M.'s refusal to visit, M.M. continued to participate in scheduled parenting time with Father. The parents were unable to convince E.M. to visit with Father, causing the parties to file various motions in the trial court.

{¶4} In November 2011, Mother moved to modify the shared parenting plan, seeking to alter the parenting time schedule and child support amount. In December 2011, Father filed a motion seeking several things: (1) that Mother show cause why she should not be held in contempt for failing to cause E.M. to follow the parenting time schedule; (2) that the shared parenting plan be terminated as it related to M.M. and that Father be named the residential parent and legal custodian of M.M.; (3) that Father be granted extended parenting time under the shared parenting plan with M.M.; and (4) that the trial court order that E.M. and Father participate in counseling to attempt to resolve the conflict between them. Prior to the hearing on the matter, Father dismissed his motion to show cause after the parties agreed to attend counseling sessions. After a number of sessions, the counselor was unable to make progress with E.M. and could not discern the reason for E.M.'s refusal to visit.

{¶5} The trial court set the remaining motions for an evidentiary hearing. Before the hearing, the court conducted an in camera interview with E.M. Following the hearing, it issued a judgment entry in which it did not grant Father's motion to terminate the shared parenting plan. Instead, it suspended parenting time between Father and E.M., modified the shared parenting

plan with respect to M.M. by designating Father the residential parent for school purposes, and limited Mother's companionship with M.M. to the standard parenting time schedule. In light of those modifications, the court also recalculated child support. Mother has appealed the trial court's judgment entry, raising two assignments of error, which she has argued together.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DESIGNATING FATHER RESIDENTIAL PARENT[.]

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ITS DECISION GRANTING APPELLANT THE STANDING ORDER OF VISITATION.

{¶6} In her assignments of error, Mother argues that the trial court erred when it designated Father the residential parent for school purposes of M.M. and granted her only standard parenting time. "A reviewing court will not overturn a trial court's determination of parental rights and responsibilities absent a showing that the trial court abused its discretion." *Zaccardelli v. Zaccardelli*, 9th Dist. Summit No. 26262, 2013-Ohio-1878, ¶ 30.

> [Revised Code Section 3109.04(E)(1)(a)] allows a court to modify a prior decree allocating parental rights and responsibilities only if (1) "a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree" and (2) the modification is in the best interest of the child. The statute also requires the court to "retain the residential parent designated by the prior decree" unless (1) the "modification is in the best interest of the child" and (2) one of three additional factors applies. Only [Section] 3109.04(E)(1)(a) expressly authorizes a court to modify a prior decree allocating parental rights and responsibilities.

*Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, ¶ 21, quoting R.C. 3109.04(E)(1)(a).

"An allocation of parental rights and responsibilities is a designation of the residential parent and

legal custodian. Therefore, R.C. 3109.04(E)(1)(a) controls when a court modifies an order designating the residential parent and legal custodian." *Fisher* at ¶ 26.

{¶7} Mother argues that, in order to find that a change of circumstances occurred which would allow it to alter the shared parenting plan with respect to M.M., the trial court had to find a change of circumstances occurred involving M.M. Additionally, Mother argues that naming Father the residential parent for school purposes was not in M.M.'s best interest.

{¶8} The trial court concluded that "there has been a change of circumstances in this matter in that the older child, [E.M.], has not visited with her Father since July[] 2011, and as indicated, she will not visit with her Father." Mother does not contend that this change in circumstances was not a change of substance as required under Section 3109.04. Instead, she argues that, because the change did not involve M.M., it was not a change of circumstances allowing the court to modify the shared parenting plan with respect to M.M.

{¶9} Upon review of the statute, we see nothing in Section 3109.04(E)(1)(a) that imposes the kind of limitation Mother contends exists given the section requires only a change "in the circumstances of the child * * * or either of the parents subject to a shared parenting decree." R.C. 3109.04(E)(1)(a). The trial court clearly found that a change had occurred in the circumstances of E.M. and Father. Moreover, Mother cites no case law which supports her interpretation of the statute. *See* App.R. 16(A)(7). It also could be argued that M.M. experienced a change in circumstances given that both E.M. and M.M. initially engaged in companionship with Father, and E.M.'s subsequent refusal to attend parenting time with Father required M.M. to attend by herself. Accordingly, in light of Mother's limited argument and the plain language of the statute, we conclude that the trial court did not abuse its discretion when it determined that a change of circumstances had occurred.

**{¶10}**  Mother next argues that it was not in the best interest of M.M. for the trial court to name Father the residential parent of M.M. for school purposes.  Section 3109.04(F)(1) provides:

> In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
>
> (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
>
> (h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

**{¶11}** Father moved to modify the shared parenting plan after E.M. became completely resistant to visiting him beginning in July 2011. The testimony revealed that, initially after the parties' divorce in April 2011, both girls went with Father for parenting time. However, within a couple months, E.M. began to ask Father if she could go to Mother's home to assist her and Father would acquiesce.

**{¶12}** During the summer of 2011, while Father had parenting time with M.M. and E.M., he invited his long-time friend and her children to attend a fun fair with him and E.M. and M.M. E.M. decided to not go to the fair and stayed at Father's house. M.M., Father, and Father's friend and her children did attend the fair. While they were there, Father and Father's friend saw Mother's van drive by with E.M. in the vehicle. Father discovered later that Mother sent him a text message saying that she was picking up E.M. because E.M. wanted to go home with her. Mother did not discuss the issue with Father or ask if it was permissible before picking E.M. up.

**{¶13}** In July 2011, both E.M. and M.M. went with Father for the scheduled visitation. During that visitation, however, E.M. decided to walk to Mother's residence without telling Father she was leaving. Father took E.M.'s phone away in response and, according to Father, E.M. stated that she would not be visiting with Father for "'a very, very long time.'" From that point on, E.M. refused to visit Father. When Father tried to discuss with E.M. her reasons for refusing to visit, the best Father could understand was that Father had paid more attention to M.M. than E.M. Mother testified that she did not approve of E.M.'s behavior and imposed

consequences, such as grounding, for E.M.'s non-compliance. E.M., however, remained steadfast in her refusal to visit with Father. Nonetheless, during this entire time period, M.M. continued to willingly accompany Father when he would arrive to pick her up for parenting time. Father continued to try to get E.M. to accompany him, and would engage E.M. at the door of Mother's home, but E.M. would not go with him.

{¶14} At trial, Jennifer Hodgson, the counselor who ultimately met with E.M., Mother, and Father, indicated a refusal to visit is very common. She could not validate Father's position that Mother was responsible for E.M. not wanting to visit with Father and she stated that both parents presented as doing everything in their power to try to make counseling with E.M. successful. Accordingly, she held a favorable view as to both parents. Ms. Hodgson indicated that she was surprised by E.M.'s adamancy. She described E.M. as very certain in her decision about not participating in visitation and counseling.

{¶15} Ms. Hodgson also opined that she did not believe it was important to bring M.M. to counseling. Moreover, she was not surprised over the fact that there was a problem with one child and not the other. Although environment plays a role, Ms. Hodgson noted that everyone is different and that relationships between parents and children are different. Ms. Hodgson did not believe that Mother did anything wrong by not being able to bring E.M. to the counseling sessions. She advised that the parents should avoid in engaging in power struggles with E.M. and that involving the police or something of that nature would not be productive.

{¶16} The record does not reveal that Mother engaged in conduct designed to alienate Father from E.M. Mother supported taking E.M. to a counselor and she testified that she made numerous attempts to get E.M. to cooperate, which included talking with E.M. and urging her to visit with Father, as well as discipline, which included grounding and requiring E.M. to do

additional chores. Nonetheless, there was some suggestion in the record that Mother did not always fully carry out the punishments to completion and/or did not take away E.M.'s favorite activities as punishment. It is unclear from the record, however, whether stricter consequences would have had any effect or would have prompted even more rebellion from E.M.

{¶17} Consistent with the counselor's observations, Mother made an effort to maintain good relations with Father's relatives and encouraged contact with them. On several occasions she offered Father more time for M.M. to spend with Father and his family. In addition, Mother sought out the assistance of the paternal relatives in encouraging contact with them in the hope that this would create opportunities for Father to interact with E.M. On one occasion, before any litigation occurred, Mother sought the advice of Father's sister in seeking strategies to promote visitation between Father and E.M. With respect to M.M., Mother was flexible in granting additional visitation with paternal relatives and with Father when requested. Mother's biological daughter K.M., whom it seems E.M. looks up to, also encouraged E.M. to visit with Father.

{¶18} The record reflects that the parties have different parenting styles. Father appears to be stricter in enforcing rules while Mother is more flexible and less controlling. Based on the record, it is possible Mother's more permissive parenting style may have contributed to her sometimes allowing questionable activities in her home. For example, Mother allowed K.M., who was then in college, to have a "hookah" (which involves smoking flavored tobacco from a pipe) party at Mother's house. Some of K.M.'s friends who attended the party were still in high school and E.M. was present as well. Additionally, Mother allowed underage drinking at her home one New Year's Eve while E.M. and K.M. and some of her friends were present. Mother partook in the drinking as well.

{¶19} With respect to implementing the shared parenting plan, Father was often more exacting, while Mother appeared to be less so. For example, on one occasion, Mother offered Father more companionship time with M.M. Father, however, refused to take the time because that visitation was not part of the express terms of the shared parenting plan. Father criticized Mother for enrolling E.M. in dance without first telling him as required under the plan, despite the fact that Father enrolled M.M. in volleyball without first checking with Mother. The girls had been regularly involved in both activities. Nonetheless, Mother did not criticize Father for enrolling M.M. without her permission and did not view it as a violation of the shared parenting plan.

{¶20} Father also maintained that Mother deliberately withheld information from him, while Mother stated she attempted to speak with Father about various issues, but Father refused to sit down and discuss things. Mother pointed to specific examples where she had invited Father into her home to discuss matters but Father would not do so. Father also criticized Mother for not telling him immediately about concerns that M.M. might have dyslexia. Although Mother did discuss the matter with Father, she explained that she had made some preliminary investigation prior to speaking to him about it. Father, however, maintained that Mother had violated the shared parenting plan by not immediately notifying Father from the inception. Father had the same criticism that Mother failed to tell him when E.M.'s first gynecological exam would take place, only notifying him after the appointment.

{¶21} Overall, the testimony revealed that both parents maintained a very good relationship with M.M. and she was described as a very bright and caring child. Various witnesses described both parents in a positive light, and it is clear from all the witnesses' testimony that both parents love their children very much and make them a priority in their lives.

In sum, the record reflects that both parents have done a good job of parenting M.M. and working together under the shared parenting plan. Father's friend noted that she observed Father and Mother at volleyball and that they were "[s]urprisingly civil." There was no evidence that either parent's conduct or parenting had negatively impacted M.M.

{¶22} We also note that the witnesses generally discussed both E.M. and M.M. in a positive light. There was testimony that E.M. and M.M. bickered with each other as had occurred with K.M. and E.M. Father's father testified that "there's always been a bit of contention between the two of them bickering and fighting. * * * [T]here was a good amount of time where they were a little uncomfortable with each other." He also indicated that E.M. and K.M. have become very close and that E.M. "doesn't seem to want to have time for [M.M.] now." K.M. testified that E.M.'s and M.M.'s relationship is much like K.M.'s and E.M.'s relationship was when they were that age; K.M. testified that she and E.M. used to fight but they "grew out of it." Father's sister stated that she felt that there was "a lot of animosity from [E.M.] towards [M.M.]. * * * I don't know what it is. I think they get along really, really well, but I feel like just the age difference, there might be a gap there as far as the things that they show common interest in and things like that." Father's mother stated that although E.M. and M.M. fight, there is sisterly love and she believes that both girls love each other.

{¶23} The trial court identified each of the statutory factors in a detailed judgment entry containing a thorough recitation of the testimony. In addition to the factors specifically listed in Section 3109.04, it also considered two other factors that it deemed relevant regarding M.M.: "Mother's reluctance to be a credible witness" and "Mother's relationship with * * * her two older daughters." The court explained that Mother's repeated unresponsiveness to questions called her credibility into question. It also noted that she had "more of a friend-to-friend

relationship rather than a mother-daughter relationship" with K.M. and E.M. It noted that, whatever techniques Mother had attempted to curb E.M.'s poor behavior, the behavior had continued. The Court also found that Mother would not push issues with E.M. for fear of offending E.M. In doing so, she failed to consider the effect that her inaction would have on E.M.'s relationship with Father.

{¶24} Much of the trial court's discussion focused on the parties' relationship with E.M. and E.M.'s conduct over the past few years. It also thoroughly discussed M.M.'s relationship with her parents and sisters, however, and found that it would be in M.M.'s best interest if Father were designated her residential parent for school purposes. The court specifically found that the advantage of relocating M.M. to Father's residence outweighed any harm that might be caused by the change in environment.

{¶25} Despite Mother's argument, upon careful review of the record, this Court cannot say that the trial court abused its discretion when it designated Father as the residential parent for M.M. Based on the testimony presented, it was reasonable for the court to conclude that Mother's permissive parenting style had contributed to the deterioration of Father's relationship with E.M. and to take steps to prevent the same thing from happening with M.M. as she nears the age where the problems with E.M. first emerged. Mother also has not convinced this Court that the trial court abused its discretion when it limited Mother's parenting time to the standard parenting time schedule. Mother's assignments of error are overruled.

### III.

{¶26} The trial court did not abuse its discretion when it modified the parties' parental rights and responsibilities. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

MOORE, J.
CONCURS.

BELFANCE, P. J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶27} I concur in the majority's resolution of Mother's first assignment of error; however, I would note that this case presents an extremely close call. After careful consideration, and given the more deferential standard of review, I agree that the trial court's

decision to designate Father as the residential parent of M.M. for school purposes was not ultimately an abuse of its discretion. Nonetheless, it is troubling that, in making this determination, much of the hearing and the trial court's entry was focused on the difficulties the parties were having with E.M. However, as indicated by the therapist, there was no evidence that Mother was attempting to alienate E.M. from Father. Instead, the testimony of the therapist suggested that children react to divorce differently and that what was occurring with E.M. was not unusual. All the while, the evidence established that M.M. was doing well and thriving under the established shared parenting companionship schedule. In addition, the evidence established that Mother had been cooperative with Father so as to support M.M.'s relationship with Father and Father's extended family. Furthermore, there was no evidence that any of E.M.'s behaviors were negatively impacting M.M.

{¶28} However, even if it is appropriate to affirm the trial court's decision as to its designation of Father as residential parent for school purposes, I respectfully dissent from the majority's resolution of Mother's second assignment of error as to its decision to award Mother standard order companionship with M.M. The trial court was required to consider whether the parenting time it awarded was in the best interest of M.M. *See* R.C. 3109.04(E)(1)(a) and I would conclude it failed to do that.

{¶29} The record in this case reveals that, mid-way into the hearing, Father's counsel asked Mother whether allowing her to have equal parenting time with M.M. would alleviate some of her concerns if Father were granted custody of M.M. At that point, the trial court interrupted and stated the following:

> Both counsel know that I am not one to come with a half and half kind of thing. I will not do that. I only approve these kinds of things if, in fact, they have been agreed upon by the parents. That's the only time. So if Father gets custody, we're not looking at half the time. I want everybody to understand that. This is

the 24th year. I have never ordered a half time. So we're looking at a standard order. We're looking at every other weekend and maybe a Wednesday night. That's what we're looking at. We're not looking at a half and half kind of thing unless parents agree to that. And that's being totally consistent in what I have done. I do not order half and halves. There will not be a half and half order if in fact Father gets custody. I don't know whether that's going to happen or not, obviously. Just so everybody understands that.

{¶30} The above comments by the trial court lead me to conclude that the trial court abused its discretion in awarding Mother the standard order of parenting time. First, it is clear that the trial court had already resolved this issue prior to hearing all the evidence. Second, it is clear that the trial court did not consider whether standard order parenting would be in M.M.'s best interest. Finally, it is clear that, given the trial court's stated policy, the trial court in effect did not use any discretion in awarding Mother standard parenting time with M.M. in accordance with its duty to exercise its discretion based upon consideration of M.M.'s best interest. Instead, the trial court had a uniform policy that did not take into account the unique facts of the parties and children before it. Accordingly, I would sustain Mother's second assignment of error and remand the matter to the trial court to consider what parenting schedule would serve M.M.'s best interest.

APPEARANCES:

ROBERT CABRERA, Attorney at Law, for Appellant.

JOHN HAYNES, Attorney at Law, for Appellee.